People v Mitchell (2024 NY Slip Op 03256)

People v Mitchell

2024 NY Slip Op 03256

Decided on June 14, 2024

Appellate Division, Fourth Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on June 14, 2024
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: SMITH, J.P., CURRAN, OGDEN, GREENWOOD, AND KEANE, JJ.

182 KA 23-01064

[*1]THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT,
v
THOMAS P. MITCHELL, JR. DEFENDANT-APPELLANT. 

EASTON THOMPSON KASPEREK SHIFFRIN LLP, ROCHESTER (BRIAN SHIFFRIN OF COUNSEL), FOR DEFENDANT-APPELLANT.
JAMES B. RITTS, DISTRICT ATTORNEY, CANANDAIGUA (KAYLAN C. PORTER OF COUNSEL), FOR RESPONDENT. 

 Appeal from a judgment of the Ontario County Court (Kristina Karle, J.), rendered May 24, 2023. The judgment convicted defendant, upon a jury verdict, of sexual abuse in the first degree, rape in the third degree, assault in the second degree, assault in the third degree (two counts), endangering the welfare of a child (two counts), harassment in the second degree (two counts) and unlawful imprisonment in the second degree. 
It is hereby ORDERED that the case is held, the decision is reserved and the matter is remitted to Ontario County Court for further proceedings in accordance with the following memorandum: Defendant appeals from a judgment convicting him, upon a jury verdict, of unlawful imprisonment in the second degree (Penal Law § 135.05), rape in the third degree (§ 130.25 [3]), sexual abuse in the first degree (§ 130.65 [1]), assault in the second degree (§ 120.05 [6]), two counts of assault in the third degree (§ 120.00 [1]), two counts of endangering the welfare of a child (§ 260.10 [1]), and two counts of harassment in the second degree (§ 240.26 [1]). Defendant contends that, contrary to County Court's determination in denying his motion to dismiss the indictment pursuant to CPL 30.30, the People failed to show that they had exercised due diligence and made reasonable efforts to identify mandatory discovery prior to filing their initial certificate of compliance (COC), and therefore the initial COC was not proper when filed and the People's declaration of readiness at that time was illusory. We agree.
After defendant allegedly committed a series of physical and sexual acts of domestic violence against the complainant over a period of years during the course of their relationship, including in the presence of their young child, the complainant reported defendant's conduct to members of the Ontario County Sheriff's Office (OCSO) in December 2020. Following an investigation by the OCSO and other preindictment proceedings, a grand jury returned an indictment in early August 2021 charging defendant with various crimes. Defendant was arraigned on the indictment in mid-September 2021, during which proceeding defense counsel requested an adjournment to accommodate the exchange of discovery.
The People filed their initial COC in mid-October 2021, which indicated that there were no records of judgments of conviction for defendant or any potential prosecution witnesses, including the complainant, and that all existing Brady material had been provided to the defense. The initial COC contained a declaration of trial readiness. Along with the COC, the People provided discovery compliance reports indicating that they had provided the defense with various discovery materials, including incident and arrest reports, grand jury testimony, witness interviews, and photographs of the complainant. In his subsequent omnibus motion, defendant requested, among other things, that the People comply with their discovery obligations pursuant to CPL article 245 and Brady/Giglio. At an appearance in early December 2021, defense counsel expressed his impression that the People had complied with their discovery obligations, but stated that he would bring any discovery deficiencies to the court's attention if he recognized any such problem in the future. The matter thereafter proceeded with a suppression hearing in early [*2]February 2022 and an appearance in late March 2022 during which the court, based on its congested calendar, scheduled a jury trial for September 2022.
Later, in late August 2022, defense counsel moved by notice of motion for a subpoena duces tecum and supporting affirmation for the production and inspection of the complainant's criminal history records based on the defense's good faith belief that the complainant had a criminal history. In particular, defense counsel sought criminal history records within the possession and control of the New York State Division of Criminal Justice Services (DCJS), which would include a repository inquiry or criminal history report. In the afternoon that same day, the Ontario County District Attorney (DA) sent an email to defense counsel explaining that the People had initially relied upon a "prior report" provided by the OCSO that had incorrectly indicated that the complainant had no criminal record, but that the complainant had informed the DA the day before that she did, in fact, have convictions from 2015 for certain offenses. The DA apologized for not knowing that information and promised to promptly provide defense counsel with the records. The DA explained in a follow-up email sent to defense counsel a couple days later that the complainant's certificates of conviction had been uploaded for electronic sharing. The certificates of conviction indicated that the complainant, in satisfaction of two superior court informations, had pleaded guilty in November 2015 before courts in Ontario County to burglary in the third degree, criminal trespass in the second degree, harassment in the second degree, and misdemeanor driving while intoxicated.
The DA contended in an answering affirmation that a subpoena duces tecum was now unnecessary. In particular, the DA explained that the People had initially been provided with a "Comprehensive Report" from the OCSO indicating that the complainant did not have any known criminal history. The DA further explained, however, that the complainant had recently disclosed during trial preparation that she did, in fact, have a criminal history. The People immediately thereafter obtained the complainant's criminal history repository and, after making efforts to obtain the complainant's certificates of conviction through the Ontario County Clerk's Office website, the People provided defense counsel with electronic copies of those certificates of conviction. The People also filed a supplemental COC in late August 2022 indicating, among other things, that the complainant's certificates of conviction had been disclosed.
Defendant thereafter moved to dismiss the indictment pursuant to CPL 30.30 on the ground that the People initially filed an improper COC and were therefore not actually ready for trial within the requisite time period. Defense counsel contended in a supporting affirmation that the People had filed an improper COC because, in violation of their statutory and constitutional discovery obligations to turn over certificates of conviction and impeaching material for prosecution witnesses, the People had represented in their initial COC that the complainant had no criminal history. Defense counsel contended that the People had failed to exercise due diligence and make reasonable inquiries to ascertain the existence of material subject to discovery because the DA's office had, itself, prosecuted the complainant on the criminal offenses for which she was convicted, and thus the documents related thereto would have been in the immediate possession of the prosecution and the involved law enforcement agencies. Defense counsel asserted that the People had "utterly failed to investigate their witness until the defense sought to investigate her prior convictions" and, "[i]f the defense had not filed the application for the [s]ubpoena [d]uces [t]ecum[,] the prosecution would not have bothered to investigate or to comply with their mandated statutory and [c]onstitutional obligations."
The People opposed the motion on the ground that, for the reasons previously provided by the DA, they had filed the initial COC in good faith and had acted reasonably under the circumstances by initially relying on the report provided by the OCSO and then promptly disclosing the additional discovery material after becoming aware of its existence. The People also pointed out that the discovery statute had been amended in May 2022 to provide that, to the extent a party is aware of a potential deficiency in a COC, that party is required to notify or alert the other party as soon as practicable. The People asserted that the defense had failed to make a timely challenge to the initial COC because, upon information and belief, defendant would have had actual knowledge of the complainant's convictions because they were involved in an intimate relationship and had a child during the time period that the complainant was on probation.
Following oral argument, the court rejected defendant's contention that the People's [*3]initial declaration of trial readiness was illusory and, over defense counsel's objection, determined that defendant, despite knowing that the complainant was on felony probation while they were living together, had not timely challenged the initial COC on the ground the People had failed to disclose the complainant's criminal history. In a subsequent written decision, the court determined that, under the circumstances presented, the People had properly filed the initial and supplemental COCs in good faith after exercising due diligence and making reasonable efforts. The court reasoned that the People had articulated the efforts that were made to ascertain the existence of, and promptly disclose, all discoverable material. The court determined that, although the People had belatedly disclosed impeachment material for a prosecution witness, the DA had taken reasonable steps and made reasonable inquiries to discharge his initial discovery obligations under the statute and, upon learning that the criminal history information provided by the arresting law enforcement agency was not accurate, the People promptly requested, secured, and disclosed the complainant's certificates of conviction and related records. The court thus determined that the COCs were not improperly filed and denied defendant's motion to dismiss the indictment pursuant to CPL 30.30. The court nonetheless concluded that, as a result of the belated disclosure, defendant was entitled under CPL 245.80 to the remedy of additional time to prepare and respond to the new material, and the court thus postponed the trial until December 2022.
With respect to the legal principles applicable to our review of the court's determination, we note that "[i]n felony cases such as this one, CPL 30.30 requires the People to be ready for trial within six months of the commencement of the criminal action (CPL 30.30 [1] [a]). Whether the People have satisfied [that] obligation is generally determined by computing the time elapsed between the filing of the first accusatory instrument and the People's declaration of readiness, subtracting any periods of delay that are excludable under the terms of the statute and then adding to the result any postreadiness periods of delay that are actually attributable to the People and are ineligible for an exclusion" (People v Cortes, 80 NY2d 201, 208 [1992], rearg denied 81 NY2d 1068 [1993]).
"Any statement of trial readiness must be accompanied or preceded by a certification of good faith compliance with the disclosure requirements of [CPL] 245.20" (CPL 30.30 [5]) and, "[n]otwithstanding the provisions of any other law" and "absent an individualized finding of special circumstances in the instant case by the court before which the charge is pending, the prosecution shall not be deemed ready for trial for purposes of [CPL] 30.30 . . . until it has filed a proper certificate pursuant to [CPL 245.50 (1)]" (CPL 245.50 [3]; see People v Bay, 41 NY3d 200, 210 [2023]). In sum, "CPL 245.50 (3) and CPL 30.30 (5), taken together, . . . require that the People file a proper COC reflecting that they have complied with their disclosure obligations before they may be deemed ready for trial" (Bay, 41 NY3d at 213-214). The People are thus required, in the COC, to "state that, after exercising due diligence and making reasonable inquiries to ascertain the existence of material and information subject to discovery, the prosecutor has disclosed and made available all known material and information subject to discovery" and to "identify the items provided" (CPL 245.50 [1]). "CPL 245.60 imposes a continuing duty to disclose, and when the People provide discovery after a COC has been filed, they must file a supplemental COC" (Bay, 41 NY3d at 209; see CPL 245.50 [1]).
Consequently, "[u]nder the terms of the statute, the key question in determining if a proper COC has been filed is whether the prosecution has 'exercis[ed] due diligence and ma[de] reasonable inquiries to ascertain the existence of material and information subject to discovery' " (Bay, 41 NY3d at 211, quoting CPL 245.50 [1]; see also CPL 245.20 [2]; 245.50 [3]). "Although the statute nowhere defines 'due diligence,' it is a familiar and flexible standard that requires the People 'to make reasonable efforts' to comply with statutory directives" (Bay, 41 NY3d at 211). "Reasonableness, then, is the touchstone" (id. at 211-212). "An analysis of whether the People made reasonable efforts sufficient to satisfy CPL article 245 is fundamentally case-specific, as with any question of reasonableness, and will turn on the circumstances presented" (id. at 212). Although "[t]here is no rule of 'strict liability' " and thus "the statute does not require or anticipate a 'perfect prosecutor[,]' . . . the plain terms of the statute make clear that while good faith is required, it is not sufficient standing alone and cannot cure a lack of diligence" (id.). In assessing due diligence, "courts should generally consider, among other things, the efforts made by the prosecution and the prosecutor's office to comply with the statutory requirements, the volume of discovery provided and outstanding, the complexity of the case, how obvious any missing material would likely have been to a prosecutor exercising due [*4]diligence, the explanation for any discovery lapse, and the People's response when apprised of any missing discovery" (id.). "Although belated disclosure will not necessarily establish a lack of due diligence or render an initial COC improper, post-filing disclosure and a supplemental COC cannot compensate for a failure to exercise diligence before the initial COC is filed" (id.).
Where, as here, "a defendant bring[s] a CPL 30.30 motion to dismiss on the ground that the People failed to exercise due diligence and therefore improperly filed a COC, the People bear the burden of establishing that they did, in fact, exercise due diligence and ma[k]e reasonable inquiries prior to filing the initial COC despite a belated or missing disclosure" (id. at 213). "If the prosecution fails to make such a showing, the COC should be deemed improper, the readiness statement stricken as illusory, and—so long as the time chargeable to the People exceeds the applicable CPL 30.30 period—the case dismissed" (id.).
Here, upon our review of the circumstances presented, including the aforementioned illustrative list of relevant factors, we conclude that the People failed to meet their burden of establishing that they exercised due diligence and made reasonable inquiries prior to filing the initial COC (see id. at 215-216). The record belies the People's representation on appeal that they "promptly requested [that] the [OCSO] compile a 'Comprehensive Report' on the [complainant]" as part of their due diligence efforts to fulfill their disclosure obligations that arose following defendant's indictment. The report was dated in January 2021, meaning that the report was obtained by the OCSO in the course of its investigation shortly after the complainant first reported defendant's conduct in December 2020 and that the report predates the August 2021 indictment by over six months. Thus, contrary to the court's determination and the People's assertion, the record establishes that the People did not undertake any reasonable affirmative steps to obtain and disclose the complainant's criminal history prior to filing the initial COC; instead, as the DA acknowledged in his first email to defense counsel, the People had actually just relied on the "prior report" from the OCSO indicating that no criminal records were found for the complainant.
Reliance on the report provided by the OCSO may have been in good faith, but "while good faith is required, it is not sufficient standing alone and cannot cure a lack of diligence" (id. at 212). The DA's office, as a qualified agency entitled to access such information maintained pursuant to statute by DCJS, did not mention any pre-COC attempts to obtain the complainant's criminal history record from DCJS (see Executive Law §§ 835 [9]; 837 [6]; 845-b), nor did the DA suggest that the People, prior to filing the initial COC, ever checked their own files to determine whether the complainant—their prime witness on whose testimony the success of the prosecution would depend—had a criminal history. Instead, the People relied entirely on a non-DCJS report provided by the OCSO that appeared to have been prepared by an unidentified third-party responsible for running background checks, and the People did not independently check the complainant's repository to determine whether the complainant had a criminal history until prompted by defense counsel's request for a judicial subpoena, at which point the People easily obtained and disclosed the complainant's certificates of conviction (cf. People v Caruso, 219 AD3d 1682, 1685 [4th Dept 2023]). Under these circumstances, we conclude that the People's explanation for the discovery lapse was insufficient (see generally Bay, 41 NY3d at 212).
Despite the length of time over which the alleged domestic abuse occurred, the case is not particularly complex and, as in Bay, the People's overall disclosure of various other discovery materials is, under the circumstances of this case, insufficient to establish that they exercised due diligence and made reasonable inquiries to identify mandatory discovery items (see id. at 205, 212, 215-216; cf. People v Cooperman, 225 AD3d 1216, 1220 [4th Dept 2024]). The complainant's criminal history, including judgments of conviction (see CPL 245.20 [1] [p]), constituted a significant mandatory item of discovery that was "critical to the underlying case," particularly considering that the success of the prosecution would depend upon the credibility of her testimony, and yet the People failed to undertake the requisite efforts to ascertain the existence of that discovery material (Cooperman, 225 AD3d at 1220; see generally Bay, 41 NY3d at 215). The record establishes instead that "[t]he belated disclosure here consisted of routinely produced disclosure materials," which were in the possession of the People and would have been readily apparent to a prosecutor exercising due diligence (Bay, 41 NY3d at 215; cf. Cooperman, 225 AD3d at 1220; People v Watkins, 224 AD3d 1342, 1344 [4th Dept 2024], lv denied 41 NY3d 986 [2024]). Moreover, while the People admirably responded promptly to the [*5]missing disclosure by admitting their detrimental reliance on the report, obtaining and disclosing the complainant's criminal history, and filing a supplemental COC, "post-filing disclosure and a supplemental COC cannot compensate for a failure to exercise diligence before the initial COC is filed" (Bay, 41 NY3d at 212). Although the People are undoubtably correct that "the statute does not require or anticipate a 'perfect prosecutor,' " neither does the statute tolerate—as Bay itself demonstrates—a lack of due diligence (id.). For the aforementioned reasons, we conclude under the circumstances presented here that the People failed to meet their burden of establishing that they exercised due diligence and made reasonable inquiries prior to filing the initial COC (see id. at 215-216). Consequently, the court "should have determined that the [initial] COC was improper and accordingly stricken the statement of readiness as illusory" (id. at 216).
Inasmuch as the court determined that the initial COC was proper and thus that the People's statement of readiness at that time was not illusory, the court did not rule on whether the time chargeable to the People exceeded the applicable CPL 30.30 period. Where, as here, " 'the record does not reflect that the court ruled on a part of a motion, the failure to rule on that part cannot be deemed a denial thereof' " (People v Session, 206 AD3d 1678, 1682 [4th Dept 2022]; see generally People v Concepcion, 17 NY3d 192, 197-198 [2011]). We therefore hold the case, reserve decision, and remit the matter to County Court to determine whether the People were ready within the requisite time period (see CPL 30.30 [1] [a]), including the applicability and effect, if any, of defendant's obligation under CPL 245.50 (4) (b)—which became effective during the pendency of the prosecution—to notify or alert the People to the extent he was aware of a potential defect or deficiency related to the COC, which awareness was a disputed issue before the court (see L 2022, ch 56, § 1, part UU, § 1, subpart D, § 1; see generally People v Rojas-Aponte, 224 AD3d 1264, 1266 [4th Dept 2024]; Session, 206 AD3d at 1682).
All concur except Curran and Keane, JJ., who dissent and vote to affirm in the following memorandum: We respectfully dissent and would affirm. In applying People v Bay (41 NY3d 200 [2023]), courts are required to make a "holistic assessment of the People's efforts to comply with the automatic discovery provisions, rather than a strict item-by-item test that would require us to conclude that a [certificate of compliance (COC)] is improper if the People miss even one item of discovery" (People v Cooperman, 225 AD3d 1216, 1220 [4th Dept 2024]). Here, as we shall explain in greater detail below, the People timely "produced a trove of discovery" constituting "extensive, pertinent documentation to the defense" (People v Williams, 224 AD3d 998, 1003, 1006 [3d Dept 2024]). Consequently, we reject the majority's conclusion that, on the record before us, the initial COC was improper based solely on the People's failure to timely produce, as impeachment material under CPL 245.20 (1) (k) (iv), two certificates of conviction belonging to the complainant in this case. Rather, we conclude that the People exercised due diligence to obtain and furnish to defendant materials that were subject to automatic discovery under CPL article 245, inasmuch as, inter alia, the People's failure to disclose those certificates of conviction was "inadvertent and without bad faith," and "[t]he People took sufficient and immediate steps to provide the [impeachment materials] to . . . defendant once they were made aware of [those materials'] existence" (People v Deas, 226 AD3d 823, 826 [2d Dept 2024]). Thus, County Court did not err in denying defendant's speedy trial motion.
At the outset, we believe it helpful to our analysis of the criminal discovery issues in this case to lay out, in some detail, the underlying facts, as established by the evidence admitted at trial. Those facts provide a stark illustration of the "scourge of domestic violence" (People v Ortega, 15 NY3d 610, 619 [2010]), which "has no place in our society" (Howell v City of New York, 39 NY3d 1006, 1010 [2022]). The charges in this case stem from allegations that on multiple occasions over a three-year period, defendant sexually and physically assaulted the complainant, his then-girlfriend. Sometimes those assaults occurred in the presence of their young child.
Defendant and the complainant had known each other for several years at the time they started dating. In August 2017, they went to a bar and drank to the point of intoxication. At some point, the complainant saw defendant trying to aggressively kiss someone else, causing the couple to start arguing and resulting in them being asked to leave the bar. The complainant did not want to go home with defendant, and tried calling a friend for a ride. The friend did not answer the phone, causing the complainant to leave a voicemail.
As the complainant walked away, defendant punched her in the face, forced her into his truck, and drove to a nearby parking lot. There, defendant punched the complainant in the face again and, as the complainant tried to run away, defendant knocked her down, dragged her back to his truck, continued to hit her, and raped her. Afterward, defendant drove the complainant to his home and, while he and the complainant were still in the parked vehicle, he pulled her pants down, cut off her underwear with a knife, and unsuccessfully attempted to rape her. The complainant begged defendant to stop, jumped out of his vehicle, and drove away in her own truck. Defendant pursued the complainant and, at one point, pulled his truck alongside hers and told her that he would continue following her unless she came back to his home. The complainant was intoxicated and knew she should not be driving, so she went to defendant's home. In trying to get the complainant to come home with him, defendant also threatened to report her to the probation department because she violated a condition that prohibited her from drinking alcohol. Back at his home, defendant raped the complainant again, and grabbed a gun. At some point, defendant stopped penetrating the complainant himself and instead used his former girlfriend's vibrator to penetrate her. As a result of the assault and rape, the complainant was in pain, had scrapes all over her body, and had a black eye. The complainant took photos of her injuries. Later on, defendant took the complainant's phone, discovered the photos, and deleted the copies that he found. In text messages between defendant and the complainant that were admitted in evidence at trial, defendant admitted that he deleted the photos that he found. Despite defendant's efforts, the complainant was nonetheless able to retrieve a photo of her eye injuries, which had been saved in a different app, and that photo was ultimately admitted in evidence.
The complainant's account of the August 2017 incident was corroborated by the friend she had tried to contact for a ride. That person testified that, in the voicemail left by the complainant, there was "a lot of banging around," and that she heard the complainant "pleading for her life." The voicemail was admitted in evidence at trial. The friend also testified that, when she saw the complainant the next day, her face was "bruised," her eyes were "swollen," and her cheekbone was "shattered." In addition, the friend identified the photo of the complainant depicting her eye injuries. The complainant did not go to the hospital after the August 2017 incident because she was scared and embarrassed, and she declined to report defendant to the police. After the August 2017 incident, defendant promised he would never hit the complainant again, and the complainant continued her relationship with him because, immediately after that incident, he treated her well. A few months later, the complainant discovered she was pregnant. She rebuffed defendant's requests to terminate the pregnancy.
In July 2019, another incident of domestic violence occurred, this time in the presence of the couple's child. Following an argument, defendant threw a baby bottle at the complainant. The complainant attempted to leave with the child, but defendant grabbed her by the hair and yanked her with the child still in her arms. When the complainant retreated to her vehicle, defendant followed, pushed her against the driver's seat, and started hitting her. Eventually, the complainant agreed to go inside, at which point she noticed that the child had a big mark underneath his eye. The complainant did not call the police because she was afraid of defendant. She took photos of the child's injuries, which were entered in evidence at trial.
Another incident of domestic violence occurred about a month later—albeit one that was ultimately not charged in the indictment. On that occasion, the complainant was leaving the house with the child when she realized she had left something inside. She tried to reenter the house, but defendant would not let her in. He pushed her, causing her to fall and injure her knee. The complainant went to the hospital, but lied about what happened. She was scared to tell the truth because defendant was with her at all times. The complainant took photos of her injuries, which were entered in evidence without objection, even though, as noted above, the underlying incident was not charged in the indictment.
One night in September 2019, the complainant was lying in bed at defendant's house when the child started crying. Defendant became annoyed and, during the ensuing argument, punched the complainant in the head, even though she was holding the child. The complainant fell to the ground and noticed that blood was running down her face. She took photos of her face, which were entered in evidence. The complainant finally ended her relationship with defendant following yet another altercation that occurred in March 2020. During an argument, the complainant attempted to leave the house with the child. Defendant came up behind the [*6]complainant, kneed her in the thigh, and spat in her face. She took photos of her bruises, as well as the spit on her face, which were entered in evidence.
Months later, in December 2020, the complainant followed her attorney's advice and reported defendant's repeated assaults to the Ontario County Sheriff's Office (OCSO) in response to defendant's continued threats to seek court-ordered visitation with the child. The complainant was initially reluctant to press charges. In April 2021, during the ensuing investigation, defendant was taken into custody and interviewed by the OCSO, and the interview was videotaped and entered in evidence at trial. In August 2021, defendant was indicted on 14 counts for acts occurring between August 2017 and March 2020 in connection with various incidents of domestic violence, including some of those recounted above. Ultimately, the jury convicted defendant of nine of those counts, and of a lesser included offense under another count in the indictment.
On appeal, defendant's principal contention is that he is entitled to dismissal of the indictment on statutory speedy trial grounds because the People's initial COC was improper. The majority agrees with defendant that the People's initial COC was improper because they failed to timely produce, as impeachment material subject to automatic disclosure, two certificates of conviction belonging to the complainant. The certificates of conviction reveal that, in November 2015, the complainant pleaded guilty in Ontario County to counts of burglary in the third degree, criminal trespass in the second degree, harassment in the second degree, and misdemeanor driving while intoxicated (DWI) based on allegations that she entered a prior boyfriend's home through a window, found him with another woman, and drove away from the scene while intoxicated. Once the People realized their initial failure to disclose that evidence, they immediately produced the certificates of conviction for defendant. At trial, defendant used those materials to extensively cross-examine the complainant on her prior convictions, including with respect to their underlying facts.
In concluding that the People's initial COC was improper, the majority characterizes the complainant's prior convictions as "a significant mandatory item of discovery," thus primarily employing a scale of significance in evaluating the extent to which the People " 'exercis[ed] due diligence and ma[de] reasonable inquiries to ascertain the existence of material and information subject to discovery' " (Bay, 41 NY3d at 211, quoting CPL 245.50 [1]). The majority's conclusion that the initial COC was improper, based on the People's purported lack of due diligence, is predicated solely on their failure to timely produce the two certificates of conviction and, in so concluding, the majority assumes that "the success of the prosecution would depend upon the credibility of [the complainant's] testimony." Although such an assumption is generally true in domestic violence matters, it is insufficient to support a conclusion that the initial COC here was improper under the test set forth in Bay, inasmuch as the majority's approach in applying that standard fails to address many of the factors relevant to such analysis—most importantly, the significance of all the other discovery materials that the People did timely produce when they filed their initial COC. As indicated above, much of that material was ultimately received in evidence at trial, thus demonstrating that the People's discovery compliance fulfilled its purpose by enabling defendant to be prepared for trial. In our view, the majority's failure to consider the People's singular untimely production of the two certificates of conviction in the context of the entire discovery process undermines its conclusion that the People did not engage in due diligence at the time they filed the initial COC. Indeed, in our view, the majority's approach improperly applies a strict item-by-item test, rather than taking a global view of whether the People exercised due diligence in the context of the entire discovery process. That approach contravenes the overall circumstances-based analysis adopted in Bay that requires consideration of, inter alia, the efforts of the People to comply with the statutory discovery requirements and the volume of discovery ultimately produced.
Further, the logical endpoint of the majority's conclusion is that, when a trial involves a single complainant—as is often true in domestic violence cases like this one—the provision of impeachment materials relating to the complainant must be the paramount concern in conducting the Bay analysis. In our view, that approach does not reflect a faithful application of the non-exclusive factors that are the focus of Bay. Indeed, the majority effectively places an extra burden on the People in domestic violence cases such as this one. Here, in application, the majority's narrow focus on the certificates of conviction—to the exclusion of essentially all else—hews much more closely to the "perfect prosecutor" approach expressly eschewed by the [*7]Court of Appeals in Bay (41 NY3d at 212 [internal quotation marks omitted]; see Cooperman, 225 AD3d at 1218).
We further question the majority's sole reliance on a sliding scale of significance in weighing whether the People exercised due diligence in disclosing each item of automatic discovery subject to CPL 245.50 (1) because applying such an approach to each separate item is a wholly subjective discretionary analysis that is impossible to apply consistently. To illustrate the difficulty inherent in using a sliding scale of significance, consider that if all we had here was the complainant's DWI conviction, the majority might find that sole conviction to be of less significance as impeachment material under CPL 245.20 (1) (k) (iv) and, therefore, not warrant a finding that the entire COC was improper for the failure to timely produce it (see Cooperman, 225 AD3d at 1220). In our view, the "scale-of-significance" test seemingly adopted by the majority here, and its emphasis on analyzing each single item of discovery, rather than endorsing a holistic approach to determining due diligence, seems destined to exhaust the courts' capacity to resolve discovery disputes, which cannot have been the legislature's intention. In short, in light of the majority's analysis based on weighing the significance of a particular item of discovery that was belatedly produced, we have difficulty perceiving the line being drawn for determining when the People's failure to turn over specific items of discovery will render the COC improper.
In conducting our own Bay analysis, we conclude, contrary to the view of the majority, that—when the discovery process is viewed as a whole—the People engaged in due diligence and made reasonable efforts to timely comply with the requirements of the automatic discovery statute when they filed the initial COC. Initially, we agree with defendant and the majority that the complainant's certificates of conviction constituted impeachment material that in a perfect world should have been automatically disclosed by the People before they filed the initial COC (see CPL 245.20 [1] [k] [iv]). In evaluating whether the People's failure to do so rendered the initial COC improper, we must consider, inter alia, "how obvious any missing material would likely have been to a prosecutor exercising due diligence, the explanation for any discovery lapse, and the People's response when apprised of any missing discovery" (Bay, 41 NY3d at 212). As discussed above, in performing that analysis, we should not apply "a strict item-by-item test that would require us to conclude that a COC is improper if the People miss even one item of discovery" (Cooperman, 225 AD3d at 1220 [emphasis added]). In other words, we also must keep in mind the other factors set forth in Bay, and that "[d]ue diligence 'is a . . . flexible standard' " (id. at 1218). "An analysis of whether the People made reasonable efforts sufficient to satisfy CPL article 245 is fundamentally case-specific, as with any question of reasonableness, and will turn on the circumstances presented" (Bay, 41 NY3d at 212).
Here, the People responded promptly and thoroughly once they learned that the complainant had a criminal history that they failed to disclose in the initial COC. Specifically, at that point, which was approximately six months before trial, the People disclosed to defendant the complainant's certificates of conviction and the factual bases underlying her convictions. Moreover, irrespective of the People's disclosure, defendant was certainly aware of the factual underpinnings of the complainant's convictions based on their personal relationship—he knew, for instance, that the complainant was on probation at all relevant times. Under those circumstances and, inasmuch as the certificates of conviction could not be used as evidence in chief given their status as impeachment material, defendant had more than ample time to prepare for cross-examining the complainant despite the People's original failure to disclose.
We also note that, at the time they timely filed their initial COC, the People produced a large volume of material in this fairly complex domestic violence case that involved delayed reporting by the complainant and encompassed incidents over multiple years. By the time the People filed the initial COC, they had produced, in material part: defendant's videotaped OCSO interview; the grand jury testimony of the complainant and the lead investigator; the names of all witnesses who may be called to testify; numerous photographs, including all of the ones introduced at trial and described above; results of forensic reports, including with respect to the voicemail the complainant left on the friend's phone; the supporting affidavit for a search warrant application concerning defendant's cell phone that was ultimately denied; and all of the other materials that the People had uploaded to the electronic discovery portal, which were listed in the 17-page attachment to the initial COC. Notably, there was no issue at trial stemming from the People's alleged failure to initially produce, at the time of the COC, any item of discovery. [*8]Additionally, given the sheer volume of discovery that the People did, in fact, disclose at the time of the initial COC, the complexity of the case, and the significance of the material that was actually timely and properly disclosed, it is unclear how obvious any missing material would likely have been to the People at the time of the initial COC (see Cooperman, 225 AD3d at 1219-1220).
To be sure, viewed in hindsight, it would obviously have been better—albeit not statutorily required—for the People to run a criminal history search regarding the complainant before filing the initial COC, rather than wholly relying on the "Comprehensive Report" provided to them by the OCSO and provided to defendant as a part of automatic discovery. Notably, however, there is no suggestion in the record here that the People were in possession of a report from the New York State Criminal Inquiry System pertaining to the complainant that they withheld, or that they otherwise had any actual knowledge of the complainant's criminal convictions when the initial COC was filed that they intentionally declined to disclose. However, even assuming, arguendo, that the People's failure to run a criminal history demonstrated a lack of due diligence with respect to the specific impeachment material at issue here, we nevertheless conclude that given the extensive and pertinent material produced by the People as part of their automatic discovery obligations at the time they filed their initial COC, all of which was gathered during a months-long OCSO investigation, it was reasonable under the circumstances for the People to rely on a comprehensive report regarding the complainant's criminal history (see People v Watkins, 224 AD3d 1342, 1344 [4th Dept 2024], lv denied 41 NY3d 986 [2024]). Thus, we simply cannot agree with the majority that this singular error, despite the People's overall compliance with CPL 245.50 (1), renders the COC improper due to a lack of due diligence.
Finally, we note that, assuming, arguendo, that remittal is warranted on the record here, we agree with the majority that, on remittal, the court should consider "the applicability and effect, if any, of defendant's obligation under CPL 245.50 (4) (b)." Defendant was expressly required under that provision to "notify or alert" the People "as soon as practicable" about "potential defect[s] or deficienc[ies] related to a [COC]" to the extent that he was aware of the same (CPL 245.50 [4] [b]). Inasmuch as defendant's motion to dismiss the indictment pursuant to CPL 30.30 on speedy trial grounds was made after the effective date of CPL 245.50 (4) (b) (see L 2022, ch 56, § 1, part UU, § 1, subpart D, § 1), the court should place especial emphasis on determining in the first instance whether the speedy trial motion was made "as soon as practicable" (CPL 245.50 [4] [b]), particularly in view of defense counsel's previous assurance that he would bring any discovery deficiencies to the court's attention if he recognized any such problem in the future, and—most crucially—defendant's direct personal knowledge of the complainant's criminal history, as evidenced by his threat to report her to the probation department for drinking during one of the incidents at the center of this case. Should the court determine that defendant did not meet his obligation under CPL 245.50 (4) (b)—as appears to be the case on this record—we see no reason why, given the extent of defendant's delay in making his motion, the court could not simply decline to charge the People with most, if not all, of the time that followed the filing of the purportedly improper COC. In amending CPL 245.50 to require parties entitled to disclosure to notify their opponents of any known defects or deficiencies in a COC as soon as practicable, the legislature was clearly aiming to prevent parties—such as defendant here—from sitting on reasonably known discovery violations until the expiration of the speedy trial clock.
Entered: June 14, 2024
Ann Dillon Flynn
Clerk of the Court